**J. Gary SHAW**

v.

**FEDERAL BUREAU OF INVESTIGATION,**
Appellant.

**No. 84–5084.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 31, 1984.
Decided Dec. 5, 1984.

Miriam M. Nisbet, Washington, D.C., of the Bar of the Supreme Court of North Carolina, pro hac vice by special leave of the Court, with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellant.

James H. Lesar, Washington, D.C., for appellee.

Before WILKEY, WALD and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

This case involves a challenge to the Federal Bureau of Investigation's refusal to disclose, in response to a request under the Freedom of Information Act, 5 U.S.C. § 552 (1982) ("FOIA"), ten photographs it had obtained from a non-federal law enforcement agency. The FBI justified the withholding under FOIA Exemption 7(D), 5 U.S.C. § 552(b)(7)(D). The case raises issues of the meaning in Exemption 7(D) of the phrase "confidential information furnished only by [a] confidential source"; the showing that must be made to establish that a document is, within the meaning of that exemption, a "record compiled by a criminal law enforcement authority in the course of a criminal investigation"; and qualification under that provision of an authorized federal investigation into a state crime.

## I

On October 24, 1979, J. Gary Shaw made a formal request to the FBI under FOIA for copies of photographs of participants in an event called the Quebec-Washington-Guantanamo Walk for Peace. The photographs are attached to an FBI memorandum dealing with allegations that Lee Harvey Oswald was in Montreal during the summer of 1963. The Bureau denied Shaw's request on grounds that the information was classified pursuant to Executive Order No. 12,065 and therefore privileged from disclosure under FOIA Exemption 1, 5 U.S.C. § 552(b)(1). Shaw took an administrative appeal, and the Department of Justice affirmed the denial on March 31, 1980. In October 1981 the photographs were declassified in connection with the administrative appeal of another requester, but were not disclosed to Shaw. On March 16, 1982, Shaw sued to compel production, under FOIA, 5 U.S.C. § 552(a)(4)(B), in the United States District Court for the District of Columbia. The FBI moved for summary judgment on grounds that although the photographs were no longer classified they were properly withheld under FOIA Exemption 7(D), 5 U.S.C. § 552(b)(7)(D).

On January 13, 1983, after an in camera inspection of the relevant records, the District Court issued an Order with accompanying Memorandum denying summary judgment and requiring the FBI to disclose the photographs on grounds that it had failed to show they were obtained in the course of a criminal investigation. On November 9, 1983, after examining a supplemental affidavit submitted by the FBI in support of its motion for reconsideration,

the court issued an Order denying the motion, on grounds that although the supplemental affidavit might be sufficient to establish that the photographs were obtained in the course of a criminal investigation, they did not constitute confidential information. The FBI has appealed to this court under 28 U.S.C. § 1291 (1982).

II

■ Exemption 7(D) reads in its totality as follows:

[This section does not apply to matters that are—]

(7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would ... (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source....

5 U.S.C. § 552(b)(7). The judicial review provisions of the FOIA provide that "the burden is on the agency to sustain its action," 5 U.S.C. § 552(a)(4)(B), which of course includes establishing the availability of an exemption from disclosure, *see, e.g., Exxon Corp. v. FTC*, 663 F.2d 120, 127 (D.C.Cir.1980). It is uncontested that burden was met here except in the respects discussed below.

■ We turn first to the District Court's holding that the photographs do not constitute "confidential information" within the meaning of this provision. This appears to rest primarily on grounds that photographs taken outdoors of individuals participating in a public demonstration cannot constitute confidential information but are by their very nature public. *Shaw v. FBI*, Civil No. 82–0756, Order at 2 (D.D.C. Nov. 9, 1983) ("Order").

■ "Nonpublic" or "secret" is certainly one of the meanings that the word "confidential" may bear. But it may also mean "provided in confidence"—*i.e.*, pro-

vided with the assurance that it will not be disclosed to others. Even if the former meaning were accepted here, we would have some doubt whether the District Court's decision could be sustained, since the mere fact that an event occurred in public does not make it "public" in the relevant sense of "generally known"—as the composition of the Quebec-Washington-Guantanamo Walk for Peace evidently is not. In any case, "secret" is not the relevant meaning here. The purpose of the confidential information exemption is to prevent the FOIA from causing the "drying up" of sources of information in criminal investigations. *See* 120 Cong.Rec. 17,-036–37 (1974) (statement of Sen. Hruska, ranking minority member of Senate Judiciary Committee, criticizing earlier version of 1974 amendment to Exemption 7 which did not contain "confidential information" exemption on grounds that it would lead to drying up of FBI's sources). That purpose will not be achieved unless the person providing information under the assurance that it will not be disclosed can rely upon the fact that his disclosure will not result in further publication. He may have many reasons for desiring that result—the most common of which may be that he does not want to have to rely upon the agency's or the courts' judgment that disclosure will not reveal his identity (which is of course the basis for a separate exemption—the first clause of Exemption 7(D), which excuses the production of information that would "disclose the identity of a confidential source," 5 U.S.C. § 552(b)(7)(D)). As we have recently held, therefore, "the availability of Exemption 7(D) depends not upon the factual contents of the document sought, but upon whether the *source* was confidential and the information was compiled during a criminal investigation." *Weisberg v. United States Department of Justice*, 745 F.2d 1476, 1492 (D.C.Cir.1984). *Accord, Lesar v. United States Department of Justice*, 636 F.2d 472, 492 (D.C.Cir. 1980).

■ The District Court also supported its conclusion on grounds that the source

of the information could not be deduced by examining the photos. Order at 2. This disregards the structure of Exemption 7(D), which establishes two separate categories of exemption: (1) information that would "disclose the identity of a confidential source," and (2) information that would "disclose ... confidential information furnished only by the confidential source." 5 U.S.C. § 552(b)(7)(D). Requiring the second category to come within the first as well would render it entirely redundant. It is irrelevant to the second inquiry whether the information would reveal the identity of the source. *See Duffin v. Carlson,* 636 F.2d 709, 712–13 (D.C.Cir.1980); *Radowich v. United States Attorney,* 658 F.2d 957, 959, 962–64 (4th Cir.1981).

▉ Finally, the District Court appears to have considered that because the information in dispute involves photographs of a public act which might have been taken by any number of people, the information could not be said to have been " 'furnished only' by the [confidential] source," as the exemption requires. Order at 2. Even if we reject the explicit holding of the Fourth Circuit, *see Radowich,* and the clear implication of dicta in this circuit, *see* the passages from *Weisberg* and *Lesar* cited *supra,* that "information furnished only by the confidential source" means "only that information which is furnished by the confidential source," this analysis would still be flawed. Whatever the phrase "furnished only by the confidential source" may mean, it assuredly cannot mean "obtainable only from the confidential source."

▉ Shaw further argues on this appeal that the photographs are not privileged because their source was not a confidential one. He does not dispute that they were furnished to the FBI by a nonfederal law enforcement agency which advised the FBI that it desired to have the information and the fact of its cooperation kept confidential. Nor is it possible to deny that foreign and local law enforcement agencies can qualify as confidential sources for purposes of Exemption 7. *See Weisberg,* 745 F.2d at 1491–92; *Lesar,* 636 F.2d at 489–91.

Shaw asserts, however, that the FBI has frequently revealed other information received from the same source at issue here—which he identifies, on the basis of more or less educated guesses, as the Royal Canadian Mounted Police. This, he says, means that the source is not confidential. Even accepting Shaw's speculations as true, they do not lead to the desired conclusion. Disclosure of one piece of information received from a particular party—and even the disclosure of that party as its source—does not prevent that party from being a "confidential source" for other purposes. If that were so, all those who ever wish to protect their identity as sources would have to deal with federal law enforcement agencies either *always* on a confidential basis or else not at all. The former recourse would produce a needless restriction of information quite at odds with the main purpose of the FOIA; the latter a needless drying up of sources quite at odds with the purpose of the exemption. Indeed, even if the Bureau's earlier disclosures of information received from the RCMP were disclosures of information originally received with an assurance of confidence (something Shaw made no attempt to establish) it is impossible to see why either the Bureau's or the RCMP's willingness to eliminate the secrecy with regard to other items of information would have any bearing upon the availability of secrecy for this one.

## III

▉ To qualify under Exemption 7 of the FOIA at all, documents must meet the threshold test of being "investigatory records compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). When, however, the confidential information provision of the exemption (the second half of clause D) is invoked, the documents must in addition constitute a "record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation." The Bureau asserted that the photographs were ob-

tained in the course of a criminal investigation, but the District Court, since it believed that they did not in any event constitute confidential information, did not decide the issue.[1] The point has, however, been briefed and argued by the parties here. Since there are no disputed facts, it would be futile to remand the issue to the District Court and we proceed to its resolution.

The showing an agency must make to establish the applicability of this portion of Exemption 7(D) appears to be a question of first impression. Several courts, however, including this one, have considered the showing necessary to meet the Exemption 7(D) threshold of demonstrating that records are "investigatory records compiled for law enforcement purposes," and nothing in the text of the statute or its legislative history contradicts the logical assumption that the nature of the two showings (though not, of course, their content) is the same. In *Pratt v. Webster*, 673 F.2d 408, 420 (D.C.Cir.1982), we stated that in order to establish that an investigation is "related to the enforcement of federal laws or to the maintenance of national security," the agency must "identify [1] a particular individual or a particular incident as the object of its investigation and [2] the connection between that individual or incident and a possible security risk or violation of federal law." We made it clear that the latter, which is the equivalent of what is at issue

here, does not require direct evidence of subjective intent, but rather only a showing that "the nexus between the investigation and one of the agency's law enforcement duties [is] based on information sufficient to support at least a 'colorable claim' of its rationality." *Id.* at 421. That showing unquestionably was made here, with respect to the more specific law enforcement duty of investigating violation of a federal criminal law. The Bureau has cited several statutes whose violation could reasonably have been thought evidenced by the assassination, including those punishing rebellion or insurrection, 18 U.S.C. § 2383 (1982), seditious conspiracy, 18 U.S.C. § 2384, and advocating the overthrow of the government, 18 U.S.C. § 2385.[2] If there is ever a "colorable claim of rationality" for looking into a possible violation of the seditious conspiracy statute, 18 U.S.C. § 2384, surely it arises when the President has been assassinated.

■■■ That, however, is not an end of the matter. Obviously, the mere existence of a plausible criminal investigatory reason to investigate would not protect the files of an inquiry explicitly conducted, for example, for purposes of harassment. An objective "nexus" of the sort just described suffices to establish the exemption only if it is unrefuted by persuasive evidence that in fact another, nonqualifying reason prompted the investigation. In other words, it

---

1. As indicated in our statement of the facts, in the Memorandum Opinion accompanying its Order of January 13, 1983 the court found that the existence of a criminal investigation had not been established. *Id.* at 2. Its final Order of November 9, 1983, however, stated that "[a] supplemental affidavit executed by Special Agent John Phillips and filed with the government's motion for reconsideration may suffice to establish that the photographs were obtained in the course of a criminal investigation." *Id.* at 1–2. We reject appellee's contention that the court's earlier holding on the point subsisted as a basis for its judgment. Even if it did, we would not apply the "clearly erroneous" standard appellee urges upon us, since—as our subsequent discussion of the applicable test will show—if the facts that would justify a criminal investigation are uncontested (in this case, Oswald's suspected assassination of President Kennedy) and if no concrete evidence of pretext is

introduced, the issue becomes one of law rather than fact and thus reviewable *de novo* on appeal.

2. In addition to citing the statutes, the Bureau produced an affidavit affirming that "[t]he investigations were conducted to determine if activities of the subject of the file were in violation of one or more of [those] statutes," Affidavit of John N. Phillips at 6; *see also* Declaration of John N. Phillips at 1. In addition to being superfluous—since as we have described, subjective intent need not initially be established—this affidavit was ineffective for the desired purpose. Since the affiant was only a supervisor of the Records Management Division of the Bureau's Freedom of Information/Privacy Acts Section, and did not claim any personal participation in the investigation, his assertion cannot be assumed to have been made upon personal knowledge.

shifts the burden of production to the plaintiff. In the present case, the plaintiff produced the following sworn testimony of then FBI Director J. Edgar Hoover before the Warren Commission:

> When President Johnson returned to Washington he communicated with me within the first 24 hours, and asked the Bureau to pick up the investigation of the assassination because as you are aware, there is no Federal jurisdiction for such an investigation. It is not a Federal crime to kill or attack the President
>
> . . . .
>
> However, the President has a right to request the Bureau to make special investigations, and in this instance he asked that this investigation be made. I immediately assigned a special force headed by the special agent in charge at Dallas, Tex., to initiate the investigation, and to get all details and facts concerning it, which he obtained, and then prepared a report which we submitted to the Attorney General for transmission to the President.

*Hearings Before the President's Commission on the Assassination of President Kennedy,* Vol. V at 98 (1964). This clearly establishes that Director Hoover did not have investigation of a federal crime in mind.

■ We do not think, however, that the crime which makes the inquiry a "criminal investigation" for purposes of the exemption need be a crime under federal law. That limitation is neither explicit in the language of the exemption nor reasonably related to its principal purpose. Where, for a federally authorized purpose, a federal criminal investigatory agency has opened an inquiry into a crime perpetrated under the law of another jurisdiction, there seems to us no reason why confidential information would be considered any less deserving of protection. Whether the purpose of the prophylactic exemption is to preclude inadvertent disclosure of the identity of informants where lives may be at risk, or merely to encourage their provision of in-

formation they do not wish made public for some other reason, it is impossible to imagine why Congress would think the purpose less necessary when state crimes (which include the vast majority of violent crimes such as murder) are at issue. The only argument for the limiting interpretation, then, is that Congress's exclusive objective in the exemption was to facilitate federal agency investigation of *federal* crimes—and not of state crimes, even when the latter were being investigated for an authorized and needful federal purpose. This seems to us such an unlikely intent that we are unwilling to posit it in absence of clear indication in the legislative history. That does not exist here—in fact, as far as we can ascertain the legislative history nowhere distinguishes between investigation of federal crimes and investigation of other crimes. Since the statutory language literally covers such state-crime investigations; and since, as the present case eminently demonstrates, there is little reason why the purpose of the provision would not extend to them; we hold that an authorized federal investigation into the commission of state crime qualifies for the second half of Exemption 7(D).

Our conclusion is reinforced by the fact that there is no more reason to interpret the phrase "criminal investigation" in the last half of Exemption 7(D) as limited to investigation of federal crimes, than there is to interpret the phrase "law enforcement purposes" in the prologue of Exemption 7 as limited to federal law enforcement. While many of the cases dealing with this provision assume without analysis that it refers to "the enforcement of federal laws," *Pratt v. Webster,* 673 F.2d at 420; *see also, e.g., Church of Scientology v. Department of Defense,* 611 F.2d 738, 748 (9th Cir.1979), in the one case in which the issue was squarely presented this court held, *en banc,* to the contrary. In *Weisberg v. Department of Justice,* 489 F.2d 1195, 1198 (D.C.Cir.1973) (*en banc*), we held that the Exemption 7 phrase "law enforcement purposes" covers the Oswald investigation here at issue, which "contemplated collaboration with Texas authorities

by agents of the Secret Service and of the Federal Bureau of Investigation looking to the early apprehension and ultimately the conviction of whoever murdered President Kennedy." After considering the statement by Director Hoover set forth above, and without reference to any applicable federal law that could have been the subject of the "enforcement," we rejected the argument that the exemption was inapplicable because "the State of Texas but not the United States 'had jurisdiction over the crime,'" *id.* at 1197, and we "deem[ed] it demonstrated beyond peradventure that the Department's files ... were compiled for law enforcement purposes," *id.* at 1198. That holding not only governs here on the precise issue of the applicability of the prologue of Exemption 7,[3] but also establishes the broader principle which we have applied to the second half of Exemption 7(D), that the exemption treats authorized federal investigations into violations of federal law and of state law on a par. That being so, even if we assume that Director Hoover's testimony destroyed the effect of the requisite objective "nexus" with federal criminal statutes that the Bureau here established, it only replaced that nexus with other evidence that the inquiry qualified for the exemption.

We note that our holding today does not give carte blanche to federal agencies to investigate state crimes, or extend the protection of Exemption 7(D) to the product of *ultra vires* investigations. Accepting Director Hoover's statement as establishing the absence of any purpose to investigate a federal crime, what is at issue here was nonetheless—on the basis of the objective criteria we discussed above—an authorized federal investigation: directed toward the murder of a President, ordered by that President's successor, and placed within the charge of an agency with statutory authority to conduct investigations that "assist in the protection of the person of the President," 28 U.S.C. § 533 (1982).

For the reasons stated, the order of the District Court directing the FBI to disclose the photos is

*Reversed.*

---

**3.** *Weisberg* was decided before the 1974 amendments to the FOIA which limited the scope of Exemption 7 to the categories now set forth in

subparagraphs (A)–(F). The prologue, however, remained unchanged in text and in meaning.