**Arthur B. KEYS, Jr., Appellant,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, et al.**

**No. 86–5485.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 25, 1987.

Decided Oct. 2, 1987.

Carl S. Nadler, with whom William B. Bonvillian, Washington, D.C., were on the brief, for appellant.

Thomas J. McIntyre, Atty., Dept. of Justice, with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees.

Before RUTH BADER GINSBURG and WILLIAMS, Circuit Judges, and McGOWAN, Senior Circuit Judge.

WILLIAMS, Circuit Judge:

Appellant brought this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(4)(B) (1982), seeking release of Federal Bureau of Investigation files relating to Louis Adamic. The District Court granted summary judgment to the government. Appellant challenges the FBI's reliance on exemptions for "personal privacy" and "confidential sources" (exemptions 7(C) and 7(D), 5 U.S.C. § 552(b)(7)(C), (D) (1982), *as amended* by Pub.L. No. 99-570, § 1802(a) (Oct. 27, 1986)), and the adequacy of the *Vaughn* index submitted in support of the FBI's motion for summary judgment.[1]

## I. BACKGROUND

Louis Adamic was a prominent American author and social commentator of Yugoslav descent. His writings led to acquaintance with President and Mrs. Roosevelt, and he involved himself in issues of American foreign policy toward Yugoslavia during World War II. He was a staunch advocate of aid for Marshal Tito.

In November 1945, Elizabeth Bentley accused him of espionage, prompting a five-year FBI investigation of his activities. In September 1951, Adamic died under suspicious circumstances: his body was found in his burning farmhouse, with a bullet in his head and a rifle across his legs. While the New Jersey State Police Department concluded that Adamic had committed suicide, many in the Yugoslav community maintain that he was murdered. The FBI collected the police reports on Adamic's death as well as miscellaneous information from other sources, some of it suggesting foreign involvement in Adamic's death. Joint Appendix ("J.A.") at 145-46.

Arthur B. Keys, an author who is researching the American immigrant experience, submitted a FOIA request to the FBI for documents relating to Adamic. Specifically, he requested all the records in one main file on Adamic and any references to Adamic in a file on espionage activities led by Nathan Gregory Silvermaster. The FBI released most of the responsive material but withheld or redacted portions of some documents under several FOIA exemptions including, as relevant here, exemptions 1 (classified information) and 7 (law enforcement information). *See* 5 U.S.C. § 552(b)(1), (7).

Upon exhausting his administrative remedies (which resulted in some supplemental

---

1. Appellant also complains that the government's public affidavits, Joint Appendix ("J.A.") at 44-85, 98-127, failed to provide the minimal information necessary to sustain its assertion of exemption 1, 5 U.S.C. § 552(b)(1), for information properly classified. Thus, he argues, the District Court abused its discretion in denying him discovery into the validity of that exemption. Upon review of the government's *in camera* affidavit we find the public affidavits adequate, *see Goldberg v. Department of State,* 818 F.2d 71, 76-79 (D.C.Cir.1987); *Afshar v. Department of State,* 702 F.2d 1125, 1130-31 (D.C.Cir. 1983); *Military Audit Project v. Casey,* 656 F.2d 724, 736-38 (D.C.Cir.1981), and the denial of discovery well within the District Court's discretion, *see Meeropol v. Meese,* 790 F.2d 942, 960-61 & n. 9 (D.C.Cir.1986); *Military Audit Project,* 656 F.2d at 750-52. *Cf. Arieff v. Department of Navy,* 712 F.2d 1462, 1469-70 (D.C.Cir.1983) (refusing to allow applicant's counsel to inspect requested records or *ex parte* affidavits).

releases), Keys filed this suit to compel disclosure of the information still withheld.[2] The government moved for summary judgment, and supported its motion with several affidavits constituting a *"Vaughn* index" of the documents withheld. *See Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir. 1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). Keys noticed the depositions of three of the affiants to determine whether they had considered the age of the documents in question in assessing certain exemptions. The District Court stayed discovery and—on the basis of the *Vaughn* index and *in camera* review of all pages withheld in their entireties—granted the government's summary judgment motion. Keys now appeals, contending that exemptions 7(C) and 7(D) were improperly invoked and that the government's *Vaughn* index was inadequate. We affirm.

## II. EXEMPTION 7

██ The FBI claimed exemptions 7(C) or 7(D) for most of the information it withheld. Exemption 7 applies generally to "records or information compiled for law enforcement purposes...." 5 U.S.C. § 552(b)(7) (1982), *as amended by* Pub.L. No. 99–570, § 1802(a) (Oct. 27, 1986). But it exempts such documents from disclosure only to the extent that production of the information might be expected to produce one of six specified harms, *see id.* § 552(b)(7)(A)—(F). Thus, in order to prevail on an exemption 7 claim, the government must bear its burden of demonstrating both the threshold law enforcement purpose and the danger that at least one of the specified harms would flow from disclosure. *See FBI v. Abramson,* 456 U.S. 615, 622, 102 S.Ct. 2054, 2059, 72 L.Ed.2d 376 (1982). We address the threshold requirement and then the specific requirements of exemptions 7(D) and 7(C).

### A. *Law Enforcement Purposes*

Until recently, exemption 7 required a threshold showing that the documents in question were "investigatory records compiled for law enforcement purposes...." *See* 5 U.S.C. § 552(b)(7) (1982). After the District Court entered judgment but prior to oral argument before us, the Freedom of Information Reform Act of 1986 broadened the scope of the exemption 7 threshold by replacing "investigatory records" with the more general term "documents or information." Pub.L. No. 99–570, § 1802(a) (Oct. 27, 1986) (to be codified at 5 U.S.C. § 552(b)(7)); *see id.* § 1804(a) (amendment applies "to any civil action pending" on Oct. 27, 1986).

██ On the requirement that survives the 1986 amendments ("compiled for law enforcement purposes"), the controlling precedent is *Pratt v. Webster,* 673 F.2d 408 (D.C.Cir.1982). Central to *Pratt's* analysis was its conclusion that a "criminal law enforcement agency['s]" invocation of "law enforcement purposes" warrants greater deference than do like claims by other agencies. 673 F.2d at 418. Rooted in the proposition that government agencies "typically go about their intended business," *id.* at 417–18, this view clearly survives the 1986 amendments.

In light of that deference, *Pratt* requires simply that the nexus between the agency's activity (under the old scheme, an "investigation") and its law enforcement duties "must be based on information sufficient to support at least 'a colorable claim' of its rationality." *Id.* at 421 (emphasis omitted). An objective finding of such a nexus is refutable only by "persuasive evidence that in fact another, nonqualifying reason prompted the investigation." *Shaw v. FBI,* 749 F.2d 58, 63 (D.C.Cir.1984). As the validity of this test does not depend in the slightest upon whether the agency activity in question is an "investigation" or a "compilation," it too remains unaltered by the 1986 amendments.

Application of *Pratt's* nexus test to this case is straightforward. The parties have conveniently sorted the documents at issue

---

**2.** The complaint named as defendants the Attorney General and the FBI Director, both in their official capacities, and the Department of Justice and FBI. We refer to them collectively as "the government."

into three roughly chronological categories, based upon the government's purported motive for their compilation.

Between 1941 and 1945, a government affidavit avers, two directives prompted the creation and compilation of Adamic's file. J.A. at 142. Most of the information on Adamic was gathered pursuant to a 1939 presidential directive that the FBI gather information "relating to espionage, counterespionage, sabotage, subversive activities and violations of neutrality laws." *Id.* All documents gathered pursuant to that directive were characterized as "Security Matter," *id.* at 23, and filed under "classification 100," which corresponds to the label "Internal Security," *id.*

■ The only document inserted into Adamic's file in the first period that does not appear clearly to have been prompted by the presidential directive is a 10-page memorandum, dated December 1, 1941, created in response to FBI Director J. Edgar Hoover's scrawled query, "What do we know about Adamic?" *Id.* at 143. The memo compiles references to Adamic in other files. According to the government affidavit:

> Most of the information [deleted from that memorandum] was from treason investigations.... One reference was from another file in the 100 [Internal Security] classification and one from a file in the 39 (Falsely Claiming Citizenship) classification [of the FBI's filing system].

*Id.*

The government has satisfied its burden of demonstrating that it compiled the documents in this first category pursuant to an objectively reasonable law enforcement purpose. Concededly, Hoover's cryptic query bespoke no particular motive. But that is irrelevant. The bits of information withheld from the responding memorandum merely reiterated material that indisputably was "compiled [in other documents] for law enforcement purposes." Accordingly, those bits fall within exemption 7's purview, regardless of the purpose of the document that compiles them. *See*

*FBI v. Abramson,* 456 U.S. at 623–31, 102 S.Ct. at 2060–64.

As to the remainder (and bulk) of the information withheld in the first category, appellant does not dispute that the terms of the 1939 presidential directive ("espionage, counterespionage, sabotage, subversive activities and violations of neutrality laws") *could* in some circumstance furnish an objectively reasonable motive to gather information in the name of national security or law enforcement. He disputes instead the reasonableness of the FBI's reliance on that directive to collect the information on Adamic.

Plaintiff's claim depends on a suggestion that documents nominally gathered pursuant to obviously qualifying law enforcement objectives were in reality not so. Plaintiff offers nothing to support such a suggestion, and what data we have supports the opposite. Practically every document in Adamic's file in the first category bears the telltale "Internal Security—C" label. Merely to stamp a document "national security" does not of course make that characterization reasonable. The label does, however, suggest that the document's preparer considered that characterization reasonable. *Cf. Smith v. Nixon,* 807 F.2d 197, 202 (D.C.Cir.1986). That so many FBI preparers reached the same conclusion bolsters the credibility of that judgment. And that they all reached the conclusion oblivious to its potential relevance in a lawsuit that would be brought over four decades later, based on a statute that would not be enacted for two decades, tends to negate any extraneous motive.

We need not rest entirely on the inferences drawn from contemporaneous characterizations of the documents. The material compiled in response to Hoover's inquiry alone furnished sufficient reason to collect further information on Adamic in the name of law enforcement. Adamic's known affiliation with organizations that were strongly suspected of harboring Communists furnished a rational basis for continued collection of whatever information might turn up about his activities. *See Lesar v. Department of Justice,* 636 F.2d

472, 475–76, 486–87 (D.C.Cir.1980) (dictum) (FBI's initiation of investigation of Martin Luther King, Jr. to determine whether he or his affiliates were Communists was legitimate). Exemption 7's threshold requires no more.

■ The second category of documents corresponds roughly to the period between November 1945 (when Elizabeth Bentley accused Adamic of espionage) and September 1951 (when he died). According to the government affidavit, the inquiry focused primarily on Adamic's contact with the Nathan Gregory Silvermaster group, J.A. at 144, whose members were under investigation for espionage under 18 U.S.C. §§ 792–797, and some of whose members were ultimately convicted. The rationality of a law enforcement purpose for collecting information on Adamic's activities could hardly be more "colorable." Appellant practically concedes as much, attacking only (and only halfheartedly) the investigation's duration. Reply Brief for Appellant at 17 n. 31; *see also* Brief for Appellant at 28. We can imagine circumstances in which an activity, rationally related to a law enforcement purpose at the outset, might run astray, *see Lesar*, 636 F.2d at 475–76, 487 (dictum), or with the passage of time lose its rationality, *cf. Halperin v. Kissinger*, 807 F.2d 180, 191 (D.C.Cir.1986). This is not one of them.[3]

■ The third category, gathered from Adamic's death in September 1951 until 1959, comprises FBI collections of copies of local police reports on the ensuing murder investigation and other miscellaneous information regarding possible foreign involvement in Adamic's death. Of course, the local police reports themselves are "records or information compiled for law enforcement purposes." As such, those reports fall squarely within the language of the exemption 7 threshold regardless of the

FBI's motive in collecting them, *see Bevis v. Department of State*, 801 F.2d 1386, 1388 (D.C.Cir.1986) (information gathered to aid law enforcement by foreign nations qualifies), as does any FBI summary of their contents, *see Abramson*, 456 U.S. at 623–32, 102 S.Ct. at 2060–640. Thus, we need only seek a qualifying *FBI* purpose for the information that it independently compiled.

Appellant's sole argument is that no such purpose would have been reasonable because Adamic's death implicated "at most ... state laws." Brief for Appellant at 27 n. 70. That is both false and irrelevant. The Adamic case was not an ordinary murder investigation. Appellant, who seems to be among those who still believe that Adamic may have been assassinated, perhaps by foreign operatives, does not deny that the FBI could reasonably have acted on a like hunch. That suspicion alone would have justified probing the incident for leads to possible violations of any one of several *federal* laws, see, e.g., 18 U.S.C. § 2382 (1982) (treason); *id.* § 2383 (rebellion or insurrection); *id.* § 2384 (seditious conspiracy); *see also* Pub.L. No. 81–831, §§ 101–116, 64 Stat. 1019–30 (repealed 1971) (previously codified at 50 U.S.C. §§ 811–826) (emergency detention of suspected security risks), that were then in existence. *See Shaw*, 749 F.2d at 63.

■ There is, at any rate, no requirement under exemption 7 that any violation of federal law be implicated, so long as the information is compiled for a "federally *authorized* [law enforcement] purpose." *Bevis*, 801 F.2d at 1388 (emphasis added) (citation and internal quotes omitted); *see Shaw*, 749 F.2d at 64. As this court recently concluded, "it is clear" that investigation of the assassination of a prominent political figure (there, Martin Luther King, Jr.) connotes such a purpose. *Weisberg v. Depart-*

3. On the basis of the information gathered during the Silvermaster espionage investigation, Adamic's name was placed on the "Security Index," compiled under several national security statutes, for the latter two years of his life, J.A. at 144–45. *See* National Security Act of 1947, Pub.L. No. 80–253, 61 Stat. 495, 496–97 (codified as amended at 50 U.S.C. §§ 401–403); Subver-

sive Activities Control Act of 1950, Pub.L. No. 81–831, §§ 2–15, 64 Stat. 987, 987–1003 (codified as amended at 50 U.S.C. §§ 781–798); Emergency Detention Act of 1950, Pub.L. No. 81–831, §§ 100–111, 64 Stat. 1019–29 (previously codified at 50 U.S.C. §§ 811–826) (repealed 1971).

*ment of Justice,* 745 F.2d 1476, 1491 (D.C. Cir.1984). *See also Bevis,* 801 F.2d at 1388 (federal law enforcement purpose supported in part by "strong U.S. public policy interest in facilitating Salvadoran efforts to bring to justice those who have murdered U.S. citizens"); *Shaw,* 749 F.2d at 64 (finding federal law enforcement purpose in "collaboration with [state] authorities ... looking to the early apprehension ... and conviction" of President Kennedy's assassin); *Weisberg v. Department of Justice,* 489 F.2d 1195, 1200–01 & n. 12 (D.C.Cir. 1973) (en banc) (same), *cert. denied,* 416 U.S. 933, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974).[4]

Appellant has suggested no reason to suspect the government's colorable claim of a rational law enforcement purpose with respect to any of the three classes of documents. He is, *a fortiori,* far from adducing "persuasive evidence" of some nonqualifying purpose. *Shaw,* 749 F.2d at 63. The government has sustained its burden of demonstrating a law enforcement purpose behind the compilation of all the information in question.

### B. *Exemption 7(D)*

The government claimed exemption 7(D) for the bulk of material it withheld from appellant. That exemption protects such law enforcement records or information as

> could reasonably be expected to disclose [1] the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, [2] in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, infor-

mation furnished by a confidential source....

Pub.L. No. 99–570, § 1802(a) (Oct. 27, 1986) (to be codified at 5 U.S.C. § 552(b)(7)(D)).

█ Exemption 7(D) is structured so that the *source* of any information that fits within its second clause is necessarily protected under its first. *Compare Shaw,* 749 F.2d at 62. We therefore focus on the second clause, which requires the government to prove that the information sought was (1) compiled in the course of a qualifying "investigation" and (2) "furnished only by the confidential source." Appellant disputes both.

#### 1. *Qualifying "investigation"*

█ In discussing the threshold exemption 7 requirement, we noted that the requirement of an "investigation" was no longer a component of exemption 7's threshold. It remains, however, a predicate of exemption under the second clause of paragraph (D). Moreover, a qualifying FBI investigation must not merely relate to law enforcement; it must be of either a "criminal" or "national security intelligence" nature.[5]

Apart from the latter requirements, the search for a qualifying investigation follows the course of the threshold exemption 7 inquiry that *Pratt* developed before the 1986 amendments obviated the investigation requirement, *see Shaw,* 749 F.2d at 63:

> [T]he agency must "identify [1] a particular individual or a particular incident as the object of its investigation and [2] the connection between that individual or incident and a possible security risk or violation of federal law."

*Id.* (quoting *Pratt,* 673 F.2d at 420).

We have already determined above that the FBI's compilation was for law enforcement purposes. The laws in question par-

---

4. We reject appellant's implicit contention that the government's affidavit must specify the purpose that we find to be objectively reasonable, and swear that it was in fact the purpose that motivated the FBI. *See* Reply Brief for Appellant at 16 & n. 28. Such an affirmation would be "superfluous—since ... subjective intent need not initially be established." *Shaw,* 749 F.2d at 63 n. 2. Besides, absent some claim that

the affiant had personal knowledge of the events that transpired in the FBI 30 years ago, it would also be utterly ineffective. *See id.*

5. The FBI is, of course, both a "criminal law enforcement authority" and an agency authorized to engage in a "national security intelligence investigation."

took of the necessary criminal or national security features. Thus all that remains is to resolve whether the information in each category was gathered pursuant to an "investigation," within the meaning of exemption 7(D).

Like its derivative "investigatory" (which appeared in the old version of the exemption 7 threshold), "investigation" is an expansive term. Both are so expansive that we have, more often than not, understood them to impose little substantive limitation on the exemption independent of the finding of a qualifying purpose. *See, e.g., Rural Housing Alliance v. Department of Agriculture*, 498 F.2d 73, 81 n. 47 (D.C.Cir. 1974). And we have never read either to demand any more than that the gathering of information focused on "a particular individual or a particular incident as the object," *Pratt*, 673 F.2d at 420, as opposed to "routine" matters that "are ancillary to [an agency's administrative] task," *Center for National Policy Review on Race & Urban Issues v. Weinberger*, 502 F.2d 370, 373 (D.C.Cir.1974). *See, e.g., Birch v. United States Postal Service*, 803 F.2d 1206, 1210 & n. 40 (D.C.Cir.1986); *Laborers' International Union v. Department of Justice*, 772 F.2d 919, 920–21 (D.C.Cir.1984) (investigation may include many parties, events and possible crimes); *Shaw*, 749 F.2d at 63; *Stern v. FBI*, 737 F.2d 84, 88 (D.C.Cir. 1984).

█ The information on Adamic's activities in the first and second categories discussed above was all collected pursuant to inquiries that "focuse[d] with special intensity" on particular persons, either Adamic himself or his contacts. *Center for National Policy*, 502 F.2d at 373. The inquiries in the third category focused equally intensely on a particular incident— Adamic's death. None of the inquiries was "routine" by any stretch of the word.

Appellant touts two statements of a government affiant—that "[n]o investigation was conducted at [the] time" of Hoo-

ver's inquiry, J.A. at 143, and that "[t]he FBI did not investigate [Adamic's] death," *id.* at 145. Appellant reads those statements as concessions that neither the redacted contents of the Hoover memorandum nor any information in the third category was compiled in the course of an investigation within the meaning of exemption 7(D).[6]

Even assuming such a legal conclusion could bind the government or this court, we find no such concession. The first statement quoted by appellant went on to say:

> however, the information from the treason files indicated that Adamic associated with several individuals and organizations of investigative interest to the FBI.

*Id.* at 143. The context confirms what we have already observed: that the information withheld from the memorandum responding to Hoover's inquiry was gathered in the course of investigations—though of parties other than Adamic. Similarly, the second statement on which appellant relies immediately precedes a sentence that undermines appellant's creative reading:

> Although the FBI received information concerning Adamic's death on several occasions during the period 1951 to 1959, including allegations of possible foreign involvement, no significant information was developed and *further* investigation was not considered necessary.

*Id.* at 145–46 (emphasis added). The unavoidable inference from the affiant's phrase "further investigation" is that the FBI had already engaged in *some* investigation. Moreover, the references suggest no more than that the FBI did not view itself as the *primary* investigator.

### 2. Confidentiality

█ The information that the government has withheld under exemption 7(D) was furnished to the FBI by various individual and institutional informants. Although some of the documents in each of the three categories clearly evince an ex-

---

**6.** Appellant attempts to convert the first statement into an even broader concession that none of the information in the first category could have been compiled pursuant to an investiga-

tion. Even wrenched from its proper context, the statement cannot reasonably be read that broadly.

press assurance of confidentiality, the government's primary theory is that such assurances were implicit. Appellant concedes the legitimacy of the government's implied-assurance theory, Brief for Appellant at 33–34, but disputes its application here. Appellant is wise not to challenge the theory: the circuits agree without dissent that courts should find an assurance of confidentiality where it is reasonable to infer from the circumstances that its absence would impair the Bureau's ability to elicit the information. *See Miller v. Bell,* 661 F.2d 623, 627 (7th Cir.1981) (per curiam), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 484 (1982); *Johnson v. Department of Justice,* 739 F.2d 1514, 1517–18 (10th Cir.1984) (reviewing cases and categorizing standards applied). While the common sense of such an approach is most obvious in cases like this one, where the passage of nearly 50 years from the interviews virtually precludes any hope of meaningful affidavits from interview participants, *see Diamond v. FBI,* 707 F.2d 75, 78 (2d Cir.1983), *cert. denied,* 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984), courts have imposed no such limit on its application.

Although *Johnson* discerned some divergence in the circuits' application of the approach, we suspect that the split is more apparent than real. *Johnson* identified as a central position—and itself adopted—the view that, in the absence of evidence to the contrary, promises of confidentiality are "inherently implicit" when the FBI solicits information. The leading case for the view is *Miller,* 661 F.2d at 627; *see also Johnson,* 739 F.2d at 1517–18; *Donovan v. FBI,* 806 F.2d 55, 61 (2d Cir.1986); *Kimberlin v. Department of Treasury,* 774 F.2d 204, 208 (7th Cir.1985) (per curiam); *Ingle v. Department of Justice,* 698 F.2d 259, 269 (6th Cir.1983); *Branch v. FBI,* 658 F.Supp.

204, 209–10 (D.D.C.1987); *cf. Irons v. FBI,* 811 F.2d 681, 686 & n. 2 (1st Cir.1987) (leaving question open). While *Conoco, Inc. v. Department of Justice,* 687 F.2d 724, 730 (3d Cir.1982), appeared to take a more lax position, stating that an agency was required only to "identify the document and state that the information was furnished by a confidential source," *id.* at 730, it made no suggestion of readiness to accept such an assertion automatically in the face of contrary evidence.[7] Nor do the cases cited by *Johnson* for a more restrictive position—one putting the burden on the agency to establish confidentiality—necessarily deviate from *Miller.* While *Parton v. Department of Justice,* 727 F.2d 774 (8th Cir.1984), cited 5 U.S.C. § 552(a)(4)(B) (1982) for the point that the burden of justification in FOIA cases is on the agency, 727 F.2d at 776, it also quoted legislative history almost identical to the language of the *Conoco* court ("all the FBI has to do is to state the information was furnished by a confidential source and it is exempt," 120 Cong.Rec. S36871 (remarks of Sen. Hart (1974))), and itself relied on *Miller,* 727 F.2d at 776.[8]

■ Certainly *Miller's* supposition that promises of confidentiality are "inherently implicit" in FBI interviews is entirely appropriate here. The success of the FBI investigation at each of the three stages undoubtedly "depend[ed] ... upon information supplied by individuals who in many cases would [have] suffer[ed] severe detriment if their identities were known." *Donovan,* 806 F.2d at 61 (citations omitted). Those who provided information to the FBI regarding Adamic's possible Communist sympathies or criminal activity would certainly have worried that their exposure could bring harassment, ridicule or retalia-

---

7. *Lesar v. Department of Justice,* 636 F.2d 472, 492 n. 114 (D.C.Cir.1980), in dictum also quotes a statement of Senator Hart suggesting that the agency need only assert that the source was confidential, *see infra* pp. 345–346, discussing *Parton v. Department of Justice,* 727 F.2d 774 (8th Cir.1984), but fails to establish that the court favored disregard of evidence rebutting the inference of confidentiality.

8. The other cases identified by *Johnson* as supporting a more restrictive view in fact seem not to do so. *See Nix v. United States,* 572 F.2d 998, 1003–04 (4th Cir.1978); *Keeney v. FBI,* 630 F.2d 114, 119–20 (2d Cir.1980); *Deering Milliken, Inc. v. Irving,* 548 F.2d 1131, 1137 (4th Cir.1977).

tion.[9] And any individual who provided information tending to confirm that Adamic was murdered by foreign operatives would certainly have expected confidentiality lest he meet the same fate. *See Donovan,* 806 F.2d at 61.

The law enforcement authorities and other institutional sources would likewise have expected the information they provided to be kept in the strictest confidence. *Cf. Weisberg,* 745 F.2d 1476, 1492 (D.C.Cir. 1984) (local law enforcement agency can be protected by exemption 7(D)). The exchange of crime-related information among law enforcement agencies, especially in so sensitive a case, often depends on such implicit promises. *See Kimberlin,* 774 F.2d at 209. And that the New Jersey Police withheld from the public its detailed investigatory reports on Adamic's death strongly suggests that it expected the FBI to behave with equal caution. *Cf. Reporters Committee for Freedom of the Press v. Department of Justice,* 816 F.2d 730, 741 (D.C.Cir.1987).

■ Contrary to appellant's assertion, the District Court's findings did not in any way "contradict any implied promise of confidentiality." Brief for Appellant at 35 (emphasis omitted). The passage that appellant regards as contradictory essentially observes that so much time has elapsed since the events here in question

> that much of the material relating to Adamic's activities, including particularly data concerning the circumstances of his death ..., might now be released ... without injury to the flow of confidential information or to cooperation from authorities.

*Keys v. Department of Justice,* Civ. No. 85–2588, mem. op. at 9 (D.D.C. May 12, 1986). However true the observation, the District Court clearly did not leap from it, as appellant urges us to do, to the inference that *courts* should decide to release information secured under such circum-

stances. As the District Court rightly said: "Congress has not established a time limitation for exemption 7(D) and it would be both impractical and inappropriate for the Court to do so...." *Id.* at 7. *Accord, Brant Construction Co. v. EPA,* 778 F.2d 1258, 1265 n. 8 (7th Cir.1985); *Diamond,* 707 F.2d at 76–77; *cf. Curran v. Department of Justice,* 813 F.2d 473, 474 (1st Cir.1987); *Lesar,* 636 F.2d at 492.

## C. *Exemption 7(C)*

Exemption 7(C) shields from disclosure such law enforcement records or information as "could reasonably be expected to constitute an unwarranted invasion of personal privacy...." 5 U.S.C.A. § 552(b)(7)(C) (West Pocket Part 1987). The District Court's task was to balance the "privacy interest" at stake against the "public interest in disclosure." *Reporters Committee,* 816 F.2d at 737 (internal quotes and citations omitted); *see also Senate of the Commonwealth of Puerto Rico v. Department of Justice,* 823 F.2d 574, 587 (D.C.Cir.1987) ("balance [contemplated by exemption 7(C)] is not ... 'tilted emphatically in favor of disclosure' "). At least after the 1986 amendment—which substituted "could reasonably be expected to" for "would," Pub.L. No. 99–570, § 1802 (Oct. 27, 1986)—the government need not "prov[e] to a certainty that release will lead to an unwarranted invasion of personal privacy...." *Reporters Committee,* 816 F.2d at 738. It need only demonstrate a "reasonable" expectation of such an invasion.

As relevant here, the government affidavit explained that it relied on exemption 7(C) to withhold information that would tend to identify one of three types of parties: individuals mentioned in FBI investigative files, J.A. at 16, subjects of FBI investigations, *id.* at 17–18, or FBI infor-

---

**9.** There are several documents that appear to have been unsolicited. Although an assurance might not be as readily inferred when the information is volunteered, the nature of the information and the context in which it was provided makes "it ... unlikely that [the informants]

would have made [such] ... allegations had they thought the [FBI] would not keep them in the strictest confidence." *Brant Construction Co. v. EPA,* 778 F.2d 1258, 1263–65 (7th Cir. 1985).

mants, *id.* at 18.[10] It then discussed the privacy interests that disclosure of parties in each of those three categories could compromise. But not all such information was withheld. The same affiant averred that

[a]dditional information was released in those instances when it was known or could be determined through reasonable efforts that the third party was deceased, had testified, or had previously been identified.

*Id.* at 141. *See also id.* at 17.

Appellant's main contention is that "[t]hese generic assertions of Exemption 7(C) are simply impermissible," Brief for Appellant at 30; the government was obliged to "identify the individual privacy interests implicated by the specific documents" in question. *Id.* He relies largely on *Stern v. FBI,* 737 F.2d 84 (D.C.Cir.1984), in which this court stated that the exemption 7 (C) balance

must be applied to the specific facts of each case. Because the myriad of considerations involved in the Exemption 7(C) balance defy rigid compartmentalization, per se rules of nondisclosure based upon the type of document requested, the type of individual involved, or the type of activity inquired into, are generally disfavored.

*Id.* at 91 (citing *Bast v. Department of Justice,* 665 F.2d 1251, 1254 (D.C.Cir.1981)). Appellant's reliance is misplaced.

The *Stern* court did not condemn *all* "compartmentalization," but only that which is overly "rigid" (or in appellant's words, too "generic"). Of course any such sweeping condemnation would be insupportable. Every word is a kind of classification: it conveys information from speaker to listener only because it brings to mind some class of objects, persons, characteristics, or whatever. A compartmentalization is "rigid" within the meaning of *Stern* only to the extent that it ignores factors that are material, or gives undue weight to factors that are of little or no relevance. *Cf. Bevis v. Department of Justice,* 801

F.2d 1386, 1390 (D.C.Cir.1986) (generic categories permissible under exemption 7(A) so long as they are functional in allowing court to assess claim); *Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 789 F.2d 64, 67 (D.C.Cir.1986) (same). The test is the aptness of the criteria. For example, a taxonomy of individuals based only upon whether each is alive or dead might in some contexts be too broad; one based exclusively upon the subjects' hair color would normally be wholly inapt. *See Bevis,* 801 F.2d at 1390 (categories identified only as "teletypes," "airtels" or "letters" not functional).

*Stern* is entirely consistent with this view. There the government claimed exemption 7 to withhold the identities of three FBI employees who had been censured for contributing to the cover-up of illegal FBI activities. This court distinguished for exemption 7(C) purposes between the two "lower-level employees" who had "acted inadvertently," and the third "special agent in charge" who had "participated knowingly." *Id.* at 87. The court held that, because of the difference in their position and culpability, only the latter's identity should be disclosed. The district court's categorization of all three as federal employees who had been censured was too "rigid" because it ignored those important distinctions. But the court itself placed two of the three employees in one category and the third in another. *Id.* at 92–94.

▮▮▮▮ Here the affidavits did not recount details about the individuals protected beyond placing each into one of the three enumerated categories and claiming that none was ascertainably dead or previously identified. They did, however, detail the investigative context in which the documents were prepared. Moreover, the documents themselves in most instances provided further detail as to the nature of the privacy interest implicated in the context of each specific claim of exemption 7(C). Our cases, including the one cited by *Stern* for

---

**10.** The FBI also deleted under exemption 7(C) information (such as names, initials, and ranks) that might identify FBI or government person-

nel. J.A. at 14–16. As appellant does not specifically challenge the application of exemption 7(C) to these deletions, we do not address it.

the proposition quoted, *Bast*, 665 F.2d at 1254, have relied on similar or broader categories in analogous circumstances. *See, e.g., Senate of Puerto Rico*, 823 F.2d at 587–88; *Weisberg*, 745 F.2d at 1491; *Lesar*, 636 F.2d at 487–88. More importantly, appellant does not give a clue as to what types of further information would have been relevant to the exemption's validity.

The District Court, after reviewing *in camera* all the documents withheld in full, concluded that the

> individuals [whose identities were withheld] ... might be subject to harassment or embarrassment if their identity were disclosed.... [T]he passage of time has not eliminated the privacy interests of these individuals and courts have consistently recognized the need to protect privacy interests, even when dealing with dated documents....

Mem. op. at 6 (citations omitted). Appellant challenges the District Court's balancing in only two particulars. First, appellant argues that the District Court improperly accepted a government affidavit's assertion, "as a universally-true [sic] proposition, that the passage of 40 years had *no impact* on the privacy concerns at stake." Brief for Appellant at 32 (citing J.A. at 30) (emphasis added). The government affidavit asserted no such thing; nor did the District Court. Each observed—we think reasonably—only that this is a case in which the passage of time does not so dilute the privacy interest as to tip the balance the other way. *See Diamond*, 707 F.2d at 77 (privacy claims relating to investigations over 30 years old upheld where they related to communist affiliations, internal security or loyalty, espionage); *Branch v. FBI*, 658 F.Supp. 204, 209 (D.D.C.1987) (claims upheld as to investigations more than 20 years old into "questionable and overzealous law enforcement" activities).

Second, appellant points to a sworn statement by the former President of the National Slovene Society in support of the assertion that the District Court over-valued the privacy interests at stake:

> I believe most individuals associated with Mr. Adamic in the 1930s and 1940s would be proud to have their association made public. There is no need to withhold FBI files concerning Adamic out of concern for his friends and associates.

Brief for Appellant at 32. That statement is similar to the assertion we rejected in *Baez v. Department of Justice*, 647 F.2d 1328, 1338 (D.C.Cir.1980), that individuals who were investigated "would be outraged rather than embarrassed and would not object to the disclosure of this information." Our response to the unsupported speculation there is equally apt here:

> Although neither we nor the FBI can anticipate precisely what the reaction of each individual would be if it were revealed to the public that the individual had been the subject of an FBI investigation, we may surmise that many at least might either be embarrassed or experience some discomfort from the disclosure of this kind of personal information.

*Id.*

Since appellant has identified no error of law and our *in camera* review of the documents that the District Court examined has with one trivial exception revealed no clear error of fact, we uphold the government's claims of exemption 7(C). *See Reporters Committee*, 816 F.2d at 740.

 The sole exception relates to a single paragraph in an FBI memorandum dated September 26, 1951, that, according to its "deletion sheet" (a separate page stating the FBI's justification where it withheld entire pages), "refers to George Wuchinick, and shows FBI's investigative interest in this third party." Once the government identified Wuchinick as the subject of an investigation, it is hard to see how the general background information about him in that paragraph—age, sex, weight, height, eye and hair color—could have measurably invaded his privacy. Accordingly, we remand to the District Court to allow appellant to seek a determination whether the government may withhold any of this information under exemption 7(C).

III. ADEQUACY OF THE *VAUGHN* INDEX

Appellant's final contention is that the index submitted by the government under *Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir. 1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), was inadequate. Specifically, appellant challenges the adequacy of the two affidavits of Special Agent James C. Felix, which comprised most of the *Vaughn* index. *See* J.A. at 15–43 (Declaration of James C. Felix); *id.* at 139–55 (Second Declaration of James C. Felix). The Felix declarations consisted of a copy of every document, in redacted form, that appellant received in response to his FOIA request, and two lengthy affidavits discussing the redactions. Next to each deletion or on the separate deletion sheet, Felix inscribed one or more coded symbols. Each deletion sheet also included a notation identifying in slightly more detail the contents of the withheld pages.

The coded symbols categorized types of information that might fall under each of the FOIA exemptions. For example, information withheld under exemption 7(C) fell into such categories as third parties mentioned in FBI investigative files (b7c–3), subjects of FBI investigations (b7c–4), and informants (b7c–5). Information withheld under exemption 7(D) included categories such as source symbol numbers (b7d–1), information provided under an assurance of confidentiality (b7d–2), and identities of law enforcement agencies (b7d–4). The first Felix declaration explains each of the codes in considerable detail, describing generically why information so designated qualifies for exemption. As we have already noted, the declarations also describe in detail the contexts in which all the documents were collected.

 The only flaw that appellant specifies is that the Felix declarations "made no effort to identify the information that had been blacked out *on each specific document* or to explain why that information qualified for an exemption under FOIA." Brief for Appellant at 16 (emphasis added). Appellant's claim may comprise two elements. First, he may object that the FBI has not provided an individual-ized justification for every single deletion. Second, he may be complaining only that the FBI used symbols (*e.g.,* "b7c–4") at the places of deletion, thereby referring to its more detailed discussion, rather than fully repeating that discussion each and every time. In either form, the objection lacks merit. Simply put, the first objection disregards the propriety of using generic terms so long as they have been defined aptly for purposes of resolving FOIA claims; any other approach would require either a sort of phony individualization (meaningless variations of language at each invocation of a specific exemption) or a degree of detail that would reveal precisely the information that the agency claims it is entitled to withhold. Acceptance of the second objection would waste ink and paper for no material advantage to anyone.

As our post-*Vaughn* opinions make clear, it is the function, not the form, of the index that is important. *See National Treasury Employees Union v. U.S. Customs Service,* 802 F.2d 525, 527 (D.C.Cir.1986); *Lykins v. Department of Justice,* 725 F.2d 1455, 1463 (D.C.Cir.1984); *Goland v. CIA,* 607 F.2d 339, 351–52 (D.C.Cir.1978), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). An adequate *Vaughn* index serves three functions:

> it forces the government to analyze carefully any material withheld, it enables the trial court to fulfill its duty of ruling on the applicability of the exemption, and it enables the adversary system to operate by giving the requester as much information as possible, on the basis of which he can present his case to the trial court.

*Lykins,* 725 F.2d at 1463.

The declarations in conjunction with the coded deletions, accomplished those functions, and did so more efficiently and clearly than would the classical *Vaughn* index. *Cf. Donovan v. FBI,* 806 F.2d 55, 58–59 (2d Cir.1986) (upholding adequacy of indexing system identical to that employed here, described in 625 F.Supp. 808, 810 (S.D.N.Y. 1986)); *Branch,* 658 F.Supp. at 206–07 (upholding identical indexing system). Each deletion was correlated specifically and un-

ambiguously to the corresponding exemption. *Compare Founding Church of Scientology, Inc. v. Bell,* 603 F.2d 945, 948–49 (D.C.Cir.1979) (per curiam). Each exemption was adequately explained by functional categories. *Cf. Bevis,* 801 F.2d at 1390 (permitting functional categories in exemption 7(A) context); *Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 789 F.2d 64, 67 (D.C.Cir.1986) (same). And the affidavit placed each document into its historical and investigative context. *Compare King v. Department of Justice,* 830 F.2d 210, 221, 225, 230 (D.C.Cir.1987) (similar coding system with respect to exemption 1 claims found wanting "because we are left with no contextual description for documents or substantial portions of documents withheld in their entirety"; coding system used for exemption 7 claims upheld); *Powell v. Department of Justice,* 584 F.Supp. 1508, 1513–14 (N.D.Cal.1984) (similar coding system found defective for failing to "tie[ ] [exemptions] to the content of the specific deletions"). Any more specificity would have entailed disclosure of the very information withheld. *See Lykins,* 725 F.2d at 1463–64.

\* \* \* \* \* \*

Except as noted in part II.C, the judgment of the District Court is

Affirmed.