Gilbert R. SCHMERLER, Plaintiff,

v.

**FEDERAL BUREAU OF INVESTIGATION,**
Defendant.

Civ. A. No. 87–3101.

United States District Court,
District of Columbia.

Sept. 29, 1988.

Gilbert R. Schmerler, pro se.

Philip J. Lindenmuth, Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM

GESELL, District Judge.

This Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, case, which comes before the Court on cross-motions for summary judgment, illustrates the tension created under FOIA when the recognized need to protect the privacy and confidentiality of law enforcement sources conflicts with an obvious public interest in events which occurred many years ago that have become matters of considerable historical interest.

In 1931, a brilliant graduate student of anthropology from Columbia University, Henrietta Schmerler, won a fellowship to study the Apache Indians on the White Mountain reservation in Arizona. In her zest to understand the Apaches, she apparently spurned some of the admonitions of her professors and hurled herself into every aspect of life on the reservation. One night, while on her way to the Canyon Day dance, she was brutally murdered, possibly after being sexually assaulted. The Federal Bureau of Investigation solved the murder, and secured Golney Seymour's confession in November, 1931.

Plaintiff, the nephew of Henrietta Schmerler, seeks documents related to the FBI investigation of the murder. He and his sister are currently engaged in writing a book based on the murder and its reper-

cussions, which have been of continuing interest in anthropological circles and sporadic interest in the popular press.

Hundreds of pages of documents have already been released. Only a few are now in dispute. These are being withheld in whole or in part under exemptions (b)(7)(C) and (b)(7)(D) to protect privacy and confidential sources.[1] The Court has examined the documents involved in the case *in camera* and fully considered the written contentions of the parties.

The following facts, among others, are undisputed:

1. All of the information for which (b)(7) exemptions are still being claimed was compiled by the FBI, acting within the scope of its authority, for the purpose of enforcing federal law. *Keys v. Department of Justice*, 830 F.2d 337, 340 (D.C.Cir.1987).

2. The FBI completed its investigation and developed the requested documents more than 50 years ago.

3. The documents involve events of present public interest. Plaintiff states the general public interest in the following terms:

Henrietta's death caused government agencies to tighten their controls over academic field researchers, caused universities to revise their research methodology, and created lasting tensions between Native Americans and the academic community which studied them. The book also deals with the response of a particularly eminent academic department ... to a shocking and career-threatening event. It treats in depth the manner in which a "frontier" law enforcement and justice system, abetted by the national resources of the Bureau of Investigation, confronted a crime perpetrated by an Indian against a white woman. It also deals with the way in which society reacts to a crime which was both sexual in nature and committed against an independent and unorthodox young woman.

In addition, the material will illustrate in concrete form how federal law enforcement functions have been changed and perfected under agency and court rulings to protect against undue interference with individual privacy interests and defendants' rights.[2]

4. Long before this case arose, extensive disclosure of many of the F.B.I. law

---

1. (b) This section [providing for disclosure] does not apply to matters that are: ...
   (7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ...
   (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy,
   (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source. 5 U.S.C. § 552(b)(7) (1982) as amended by Freedom of Information Reform Act of 1986, Pub.L. No. 99–570 § 1802 (1986).

2. The government claims that plaintiff has failed to support "adequately ... his 'public interest' claim with respect to the *specific* information being withheld," citing *King v. United States Department of Justice*, 830 F.2d 210, 234 (D.C.Cir.1987), quoting *Senate of Puerto Rico v. Department of Justice*, 823 F.2d 574, 588 (D.C. Cir.1987). It mischaracterizes plaintiff's papers by saying he has only asserted that there exists a "public controversy ... in certain academic quarters, and that the story appears occasionally in national magazines of a sensational nature and in anthropological publications." Clearly, as quoted above, this *pro se* plaintiff has explicated areas of specific public interest in the case, though he has not legalistically correlated a particular public interest with each category of information he seeks. Most of the material being withheld might be of use in a historical narrative, even if only to avoid vagueness and create a responsible document. This Circuit has indeed required plaintiffs to specify its specific need for each *Vaughn* index category. *Bast v. United States Dep't of Justice*, 665 F.2d 1251, 1254 (D.C.Cir.1981). Plaintiff here has admittedly not particularized his request in this manner. However, he has made an adequate public interest showing to warrant disclosure in the categories specified in this opinion in the light of the weakness of most of the privacy and confidentiality claims made by the government, and in light of the fact that plaintiff has not been informed of the contents of any withheld information except in the most superficial way. He cannot be expected to say exactly why he needs something he does not have.

enforcement records occurred. As part of Director Hoover's program of portraying the invincibility and professionalism of his agents, the Department of Justice broadly disseminated information about the case during the investigation and shortly there-after.[3] In the 1940's, records were lodged with the National Archives and became available to the public. As plaintiff, without assistance of counsel, brought these disclosures to the Bureau's attention, it progressively released numerous documents previously withheld under its purely mechanized approach to disclosure of any of its law enforcement records.[4]

5. It appears that many of the persons interviewed by the government during the investigation have probably died, thus diluting privacy concerns, and in other instances there is no present apparent need to protect identity of sources.

■ Given the clear public interest in disclosure, the prior official release of information and the substantial passage of time since the well-publicized events, it appears to the Court that the F.B.I. has failed adequately to weigh these factors when asserting a continuing need to protect privacy and sources. Because the Court lacks sufficient information in this regard, a remand is necessary to enable the F.B.I. to particularize its concerns for the (b)(7) exemptions which it finds it still must assert. The F.B.I. has not met its burden of justifying its decision to withhold requested information. *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 236, 98 S.Ct. 2311, 2324, 57 L.Ed.2d 159 (1977). Privacy interests are remote at best and the public interest in disclosure has not been given sufficient weight. *Bast v. U.S. Dept. of Justice*, 665 F.2d 1251 (D.C.Cir.1981); *Fund for Constitutional Government v.*

*National Archives*, 656 F.2d 856, 862 (D.C. Cir.1981). Moreover, even confidential "sources" do not have absolute protection, and, here, there is no showing that any guarantees, express or implicit, were given informants over 57 years ago.

The material still being withheld falls into two broad classifications.

### A. Friends, Academic Colleagues and University Officials:

The F.B.I. interviewed several of Ms. Schmerler's friends and academic colleagues, who gave no clues to the murder. These sources gave glowing recommendations as to Ms. Schmerler's character, competence and academic qualifications. One of Henrietta Schmerler's friends told F.B.I. investigators that she did not believe Ms. Schmerler "had any enemies anywhere who would be desirous of causing her trouble," and another reported that she was a "studious girl of exemplary conduct." In the course of the interviews they indicated advice and specific precautions Ms. Schmerler was given prior to her field work on the reservation. Although they gave no leads to the murderer and the material is clearly of public and scientific interest, the F.B.I. has given no reasons, other than at the highest level of abstraction and speculation, for withholding this material. The F.B.I. has not distinguished between these sources, who were close friends and acquaintances of the victim, and suspects, agents, law enforcement officials and others close to the scene of the crime who were mentioned in the records.

Casual reading of newsweeklies reveals that some of the individuals interviewed are dead, while many others are in all probability dead. In fact, Schmerler has named (without accompanying documenta-

---

**3.** At the suggestion of Director J. Edgar Hoover, Special Agent-in-Charge R.H. Colvin undertook to write a narrative of the case for the Department's publicity purposes. The file indicates several instances in which the Bureau cooperated with journalists seeking to cover the case. Special Agent Colvin broadcast a radio description of the case, including the names of agents, informants and suspects. Statements from the murderer and a corroborating statement from

the murderer's brother-in-law were given to the press and published extensively.

**4.** It promptly released 131 pages of documents shown to be at the Archives, and its declaration states that when the persons mentioned in documents were the subject of public comment in connection with the murder investigation, their identities and information pertaining to them was released.

tion) those persons involved with the case who he believes are dead. The F.B.I. recognizes that death alters the calculus of privacy interests, but it has only released information from dead sources in the limited circumstances where death occurred during the investigation and is recorded in the investigative file.[5] This does not satisfy the disclosure in a matter of this vintage.

The F.B.I. is generally correct in contending that its interviews carry an assumption of confidentiality. *Londrigan v. Federal Bureau of Investigation,* 722 F.2d 840 (D.C.Cir.1983). But surely this assumption cannot be accepted when applied to interviews of friends, colleagues and professors taken more than 50 years ago. They were not given an implied assurance of confidentiality in perpetuity, particularly where the F.B.I. publicized the involvement of many of its sources at the time. Bereaved friends or shocked professors would hardly expect that their statements would be exempt from broad disclosure provisions 57 years after the interviews were given. These informants would not have had any reason to have been embarrassed at the time of the interviews for helping the FBI investigate Henrietta Schmerler's murder. To have answered in the negative questions as to whether Schmerler's letters indicated that she was afraid of anyone in particular

on the reservation or how the anthropology field program operated is not to have divulged highly confidential information that warrants continued protection 57 years later. Releasing of such information at this time is highly unlikely to dry up confidential sources today. Yet, this institutional concern is central to (7)(D) exemptions, as defendant's arguments indicate. (*See, e.g., Lesar v. United States Dept. of Justice,* 636 F.2d 472, 491 (D.C.Cir.1980); *Founding Church of Scientology v. Levi,* 579 F.Supp. 1060, 1063 (D.D.C.1982), *aff'd sub nom, Founding Church of Scientology v. Smith,* 721 F.2d 828 (D.C.Cir.1983); *Nix v. United States,* 572 F.2d 998, 1005 (4th Cir. 1978)). The alleged incentive effects which the Bureau still asserts in boilerplate fashion are not satisfactorily documented in the present context, and the Bureau must particularize its precise concerns.

So, too, the privacy interests that may be protected—on behalf of the dead or the living—are those that would cause discomfort or danger to the person who had proffered the information, or are those statements the agency protects in order to reassure future informants that their statements will be held in trust. Agencies and judges must evaluate the privacy interests at stake in each FOIA case on a factual basis, not simply apply rules of thumb.[6]

---

5. Other courts have not squarely held what agencies facing a FOIA request must ordinarily do when exemptions are being claimed for persons who are alleged to be dead, though they suggest that death diminishes privacy interests substantially. In *Diamond v. Federal Bureau of Investigation,* 532 F.Supp. 216, 226 (S.D.N.Y. 1981), *aff'd,* 707 F.2d 75 (2d Cir.1983) *cert. den.,* 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984), Judge Carter stated that:

[S]ince the material that plaintiff seeks is thirty or more years old, the privacy interests of the third parties are not all of a piece. It may well be, as plaintiff suggests, that some of the individuals connected with the investigations are now dead, in which case their privacy interests are diminished, *Cordell v. Detective Publications, Inc.,* 419 F.2d 989, 990 (6th Cir. 1969), *Prosser on Torts,* § 112 at 843 (3d ed. 1964), and the balance tips towards disclosure.

In *Branch v. F.B.I.,* the Court implied that the public interest in disclosure may outweigh the privacy interests of the dead: "[A]s long as the

individuals mentioned are alive, their privacy interest is paramount to the public interest in disclosure." 658 F.Supp. 204, 209 (D.D.C.1987) And in *King v. United States Department of Justice,* the defendant did not claim exemptions for the dead, representing that to the best of its knowledge, "the (b)(7)(C) exemption was only asserted to protect those persons who are living," as well as the fact that "where the information was publicly known or was innocuous, it was disclosed." 830 F.2d 210, 234, n. 174 (D.C. Cir.1987). No court, however, has held flatly that agencies should release information about those now dead, nor does case law insist that an agency look beyond its own investigative files to ascertain whether a source has died.

6. Case law developed in response to incidents of the most highly sensitive nature, such as espionage, assassination, or McCarthy-era allegations of Communism should not be read to universalize the supposed embarrassment of having talked to a law enforcement agency. *See, King, supra,* explaining the "McCarthy era character of the investigation," *aff'd,* 830 F.2d 210, 234;

These particular sources were "cooperating" with an investigation into a murder of their friend or star student—hardly fingering a colleague as a subversive or criminal. Yet the F.B.I. does not specify exactly what types of invasion of privacy it expects could befall Schmerler's elderly friends or professors for having spoken with the Justice Department 57 years ago.[7]

The Court therefore holds that, as to the material relating to friends and academic colleagues, the burden has shifted to the F.B.I. and the material must be released unless a specific, clearly identified need for continuing the exemption claim is shown in affidavit form. If, after 50 years, the F.B.I. still wishes to withhold these statements of friends and academic "sources," it must show that disclosure would affirmatively injure the Bureau's present law enforcement efforts, or a continuing privacy interest.

### B. Other Sources:

Another aspect of the case involves the failure of the Bureau to deal adequately with the apparent death of many who were sources of information about the murder or murderer during the investigation. This material includes some documents from sources or about suspects or third parties who were living on or near the reservation. It may well be that some of this material could incite resentments even at this late date within the tribe, but this is far from apparent in the record. Here, again, the Bureau has not yet met its burden.

■ Plaintiff's papers address one such type of information that may already have been released. He contends that information elicited by an agent acting undercover at the reservation cannot be withheld under (7)(D) because those giving the information could not have expected the F.B.I. to keep it confidential. Defendant responds that this would have a "chilling effect on potential or reluctant sources of information if they knew that an individual's identity would be disclosed merely because he or she were 'unwitting.'" Yet persons cannot be chilled from talking to agents if they do not even know they are talking to an agent. Releasing reports of idle gossip will surely not squelch the human urge to gab, and such talk was not likely to have been given in confidence or trust. *Radowich v. United States Attorney, District of Maryland,* 658 F.2d 957, 959 (4th Cir.1981) (en banc).[8] Therefore, if any such material is still being withheld, it is not entitled to a (7)(D) exemption (although it might still be eligible for a (7)(C) exemption).

■ Similarly, while names of agents involved may be protected, *Cooper v. Department of Justice,* 578 F.Supp. 546 (D.D. C.1983), those cases where the agent's involvement has been fully revealed by authorized disclosures emanating from the

---

*See also, Iglesias v. Central Intelligence Agency,* 525 F.Supp. 547, 563 (D.D.C.1981) (protecting many privacy interests, but disclosing information when "(1) there can be no suspicion of wrongdoing on their part and (2) their continued cooperation is not at stake," when these persons cannot be said to have had an expectation of secrecy). The privacy and confidentiality of interviews may both depend to some extent on the date of the interview, its context, and the information disclosed. *See, Londrigan, supra,* 670 F.2d 1164 (D.C.Cir.1981), *modified on appeal,* 722 F.2d 840 (regarding a Privacy Act request).

7. A notable example is in one of the rare instances in which the F.B.I. seems to have mislabelled a deletion. It is withholding material under the heading "Names and/or identifying information of officials at educational institutions" from a letter of January 13, 1931 signed by R.H. Colvin, in which he says he would like

to interview the Dean of Anthropology regarding such matters as how assignments were made and Schmerler's character. Since Dean Boas never gave an interview, this information seems to have little effect on privacy or confidentiality interests.

8. Defendant cites *CIA v. Sims,* 471 U.S. 159, 176, 105 S.Ct. 1881, 1891, 85 L.Ed.2d 173 (1985), and *Allen v. CIA,* 658 F.Supp. 15 (D.D.C.1986), for the proposition that unwitting sources still are confidential sources. However, these cases are in the context of national security, and in neither case was material being withheld pursuant to exemption (7)(D). For instance, the Supreme Court in *Sims* was concerned that if a foreign government knew that the CIA relied on, say, an obscure Eastern European technical journal, that source would be compromised. To hold in this case that idle chatter reported by undercover agents may now be released does not depart from the defendant's cited cases.

Bureau or Department of Justice must be excepted. *Cf., Bast,* 665 F.2d at 1255 (mere previous publicity in the popular media cannot compel release); *Lesar,* 455 F.Supp. at 925 (1978), *aff'd,* 636 F.2d 472. Again, it is not clear whether the Bureau is withholding names of agents previously publicly exposed by it.

On remand, the Bureau must clarify its reasons for withholding information relating to sources and agents as well as friends and colleagues. Plaintiff could strengthen his case for disclosure, too, by presenting independent documented information that one or more persons on whose behalf information is being withheld for privacy reasons have died. If he does so with regard to any of these sources, the burden shifts to the agency to refute the information or to show promptly that it is nonetheless in the public interest to continue to withhold that information. Acceptable documents would include official death certificates, obituaries, or other highly reliable evidence of death from persons with direct knowledge, such as, in this case, comparable Apache records.

■ The Court holds that when agents' names are being withheld on privacy grounds fifty or more years after the incident, the agency should check not only its case records, but its pension and personnel records to determine whether the agent in question has died. If the agent is deceased, a particularized need to continue withholding the information must be presented.

The Court notes that some of the exempted material from both friends and colleagues, as well as sources and agents,

seems to have been withheld as a matter of delicacy.[9] To encourage candor with investigators, such comments may surely be protected by privacy and confidentiality exemptions for a period of time. But after 50 years, general comments about Native American culture as then perceived do not rise to the level of privacy interests, nor are they confidential source material, while, on the other hand, they are clearly of anthropological interest today. Even if agents or academicians would hesitate to reaffirm such opinions in 1988, that they said something different in 1931 does not warrant a sanitizing of comments disclosed under FOIA.

The Court is remanding this case and increasing the responsibility of the F.B.I. to justify withholding (b)(7) data because of the passage of time and the increasing use of FOIA to develop historical facts of public interest. Administration of FOIA would benefit, if by rulemaking or legislation, privacy and confidential source exemptions would be subject to closer scrutiny after a specific period of time, causing an agency to meet a heavier burden to offset the presumption that death or passage of several decades diminishes the need for exemption. Common sense suggests that release of aged information will only rarely endanger sources (and this could be prevented by tailored use of exemptions), and it is hardly likely to deter persons contemplating cooperation with the F.B.I. today if sources realize they will be protected for many years but not permanently. In this regard, the Court notes the irony that other laws concerning declassification and public release of information of greater sensitivity include timetables.[10] And in

9. The F.B.I. is withholding stereotyped comments about Indian beliefs on the judicial process, Indians' maturity, truthfulness, drinking habits and sexual mores, in addition to discussion of whether Indians deserved legal representation from the government in criminal matters. From a telegram disclosing that an interview with Schmerler's friend and correspondent occurred, the F.B.I. is inexplicably redacting the fact that Schmerler was not living alone, as other documents have indicated. Rather, she was living with a woman who had an illegitimate child.

10. Information classified for national security purposes is examined for declassification after 20 years, and foreign government information is classified without review for only 30 years. The clear policy of former Executive Order 12065 and current E.O. 12356 favors declassification, even of sources. A general assertion that future release of informant's names is always damaging is unavailable even in this sensitive context. 3 C.F.R. § 1–103 at 191 (1979); *Dunaway v. Webster,* 519 F.Supp. 1059, 1067–71 (N.D.Cal.1981); *King,* 830 F.2d at 226–227, notes 124, 132. Classified information originating in the White House is subject to mandatory review

other laws, Congress has recognized the interest of historians. Most records of historical interest compiled throughout the government are transferred to the National Archives after thirty years. 44 U.S.C. § 2107 (1984).

Accordingly, in the absence of a more rational solution, this case must be remanded to the Federal Bureau of Investigation for further proceedings consistent with this Memorandum. An appropriate Order is attached.

## ORDER

Upon consideration of the parties' cross-motions for summary judgment, the responses thereto and the entire record, and for the reasons stated in the Court's Memorandum filed herewith, it is hereby

ORDERED that this matter is remanded to the Federal Bureau of Investigation for further proceedings in light of the Court's Memorandum; and it is further

ORDERED that by November 15, 1988, the Bureau shall file a report with the Court indicating in affidavit form any affirmative injuries that would occur from the release of any information pertaining to friends or academic colleagues, or, if there would be no affirmative injuries, indicating that those documents have been released.

The report shall also specify whether it still needs to continue to withhold any agent's name or any information regarding sources and suspects, although it need not specify an affirmative injury that would occur from the release of each and every name.

The report shall further indicate the results of its search of personnel and pension records to determine whether agents have died. If this search or plaintiff's documents indicates the death of an agent, source or suspect, then the Bureau must also affirmatively show a present need to continue to withhold the information.

ten years after the close of the administration which created the materials, or when the materials are archivally processed, whichever comes

The Court expects that the Bureau will deal with each withheld document individually and, if it deems necessary, it may supplement its public information with an *in camera* submission.

first, 36 C.F.R. § 1260.40 (1987), and mandatory review of the most sensitive information takes place after thirty years. 36 C.F.R. § 1260.50.