Gilbert R. SCHMERLER

v.

FEDERAL BUREAU OF INVESTIGATION, Appellant.

No. 89–5029.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 12, 1990.

Decided April 6, 1990.

As Amended April 30, 1990.

---

334

John P. Schnitker, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellant.

L. Hope O'Keeffe, with whom Irvin B. Nathan, Washington, D.C., was on the brief, for appellee.

Before SILBERMAN, BUCKLEY, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

The Federal Bureau of Investigation (the "FBI") appeals from an order of the United States District Court for the District of Columbia requiring it to disclose the names of three sources at Columbia University who gave character and background information in the FBI predecessor Bureau of Investigation's (the "Bureau") investigation of a 1931 murder. This case presents only one issue: whether exemption 7(D) of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7)(D), exempts from disclosure the names of these sources. Finding that the evidence presented by the appellee was not sufficient to rebut the presumption that FBI informants are confidential sources exempt under 7(D), we reverse.

I. BACKGROUND

In 1986, Gilbert R. Schmerler ("appellee") requested copies of all documents related to the FBI's investigation of the 1931 murder of his aunt, Henrietta Schmerler. Ms. Schmerler was a Columbia University graduate anthropology student living among and studying the Apache Indians on the White Mountain Reservation in Arizona when she was sexually assaulted and murdered. The Bureau of Investigation anticipated that the defendant would attempt to argue that Ms. Schmerler had acted provocatively and might attack Ms. Schmerler's character. As part of its investigation of this case, the Bureau interviewed the victim's friends and colleagues at Columbia University for information about her conduct among the Indians and about her character.

The record shows at least three Bureau interviews with persons at Columbia University. On July 30–31, 1931, Agent R.L.

Shivers interviewed Bertha Cohen, a friend of Ms. Schmerler, and one source whose name is being withheld. Report of R.L. Shivers (Aug. 1, 1931), FBIHQ 70–1451–5, Joint Appendix 138–40. Cohen identified a friend of the victim who was then on vacation in Cincinnati and on July 31, 1931, Agent J.R. Burdge interviewed that friend. Report of J.R. Burdge (Aug. 1, 1931), FBIHQ 70–1451–4, Joint Appendix 136–37.

These interviews were conducted primarily for the purpose of ascertaining whether the sources had received correspondence from Ms. Schmerler that might provide leads for the investigation of her murder. Telegram from R.H. Colvin to Director, Bureau of Investigation (July 30, 1931), FBIHQ 70–1451–3; Telegram from R.H. Colvin to E.J. Connelley (July 30, 1931), Joint Appendix 133.

A second series of interviews was conducted by Agent I.O. Carver at Columbia University on October 8, 1931 in response to a suggestion by Special Agent in Charge R.H. Colvin that letters from Ms. Schmerler might still be in possession of persons at the University.

> There is an indication that some letters written by Miss Schmerler may perhaps contain confidential statements by her [redacted] relative to her experience with the Indians and it may be that some [redacted] will feel reluctant to surrender these letters in view of the fact that their contents might possibly create a bad impression about the dead girl. However, our business is to apprehend the murderer, if possible and every bit of information obtainable [text missing from copy] needed for the solution of this crime....

Letter from R.H. Colvin to Special Agent in Charge (Sept. 10, 1931), FBIHQ 70–1451–13.

The Agent interviewed both Bertha Cohen and the other source previously interviewed on July 30, 1931. Additionally he interviewed one more source whose name is being withheld. On October 30, 1931 Golney Seymour was arrested. Seymour was subsequently convicted of the murder.

Finally, on January 20–21, 1932, Agent R.L. Shivers interviewed Bertha Cohen, Eli-

as Schmerler, two unnamed sources at Columbia University, and a third friend or colleague of Ms. Schmerler whose association with the University is not clear. From the record before this Court, it is not clear which, if any, of these unnamed individuals were among those interviewed on July 30–31, 1931 and October 8, 1931. These interviews, which focused on the circumstances of Ms. Schmerler's assignment to White Mountain and Ms. Schmerler's character and moral conduct, were conducted in response to a January letter from Special Agent in Charge R.H. Colvin for "additional information for the prosecution." Letter from R.H. Colvin to Special Agent in Charge (Jan. 13, 1932), Joint Appendix 152–53.

After much negotiation and litigation the only remaining point of contention between the parties concerns the names of the Columbia University sources who provided information regarding Ms. Schmerler's character. Appellee believes that the Bureau interviewed three prominent members of the anthropology department who are now deceased and seeks confirmation of his hunches. The FBI has refused to release the names of the character sources, claiming that they are exempt under FOIA exemption 7(D).

Following cross motions for summary judgment the District Court concluded that there was no evidence that the Columbia University professors had been promised confidentiality and that the deaths of the sources weighed in favor of disclosure. The District Court ordered the FBI to release the names of the Columbia University academics whom appellee had shown to have died.

## II. ANALYSIS

Exemption 7(D) exempts from release under FOIA "records or information compiled for law enforcement purposes" which "could reasonably be expected to disclose the identity of a confidential source." 5 U.S.C. § 552(b)(7)(D). Both parties agree that the information at issue here was compiled for law enforcement purposes. Because appellee's sole remaining request is

for the disclosure of the identity of FBI sources, the only inquiry for this Court is the determination whether the Columbia University academics were confidential sources.

■ We first note several of the factors apparently relied upon by the District Court that are not proper elements of the exemption 7(D) analysis. In its decision in *Schmerler v. FBI*, 696 F.Supp. 717 (D.D.C. 1988), the District Court required the FBI to "particularize its precise concerns" that releasing the information would "dry up confidential sources today." *Id.* at 720. In response to the FBI's proffer, the District Court determined that the names of the sources should be released for the following reasons:

(1) they are of historic importance; (2) they offered no clues to the murder; (3) the speakers did not expose themselves to any possible danger by speaking to the FBI; (4) 57 years have passed since the murder; (5) the persons at issue have died; and (6) the FBI now guards the details of its investigations much more scrupulously than it did in 1931....

*Schmerler v. FBI*, 700 F.Supp. 73, 75 (D.D.C.1988). As discussed *infra*, reasons (2) and (3) might in combination with other evidence support a conclusion that the circumstances did not indicate that the sources were promised confidentiality and reason (6) might give pause if the record indicated that the Bureau had, in fact, released information about these sources. Nevertheless, the other reasons cited by the Court are not bases for ordering disclosure. Exemption 7(D) of the statute protects the identity of confidential sources without regard to the FBI's interests in continued maintenance of confidentiality. The factors cited by the District Court might well be conclusive if exemption 7(D) required balancing the agency's interest in maintaining confidence against interests in disclosure. However, the statute admits no such balancing. That nearly sixty years have passed since the confidential sources were interviewed and that the sources may have died is of no moment to the analysis. The statute contains no sunset provision on

the promise of confidentiality. Once the government has demonstrated that the sources are confidential, the statute does not require the government to justify the continued withholding against claims that the confidentiality is no longer warranted or that the public interest weighs in favor of disclosure.

■ The words of 7(D) are unambiguous. As the First Circuit has held, if the information was confidentially collected, "the judiciary is not permitted to undertake a balancing of conflicting interests, but is required to uphold a claimed 7(D) exemption...." *Irons v. FBI*, 880 F.2d 1446, 1449 (1st Cir.1989) (*Irons II*) (quoting *Irons v. FBI*, 811 F.2d 681, 685 (1st Cir.1987) (*Irons I*)). This holding is in accord with the law of this and other circuits.

Exemption 7(D) differs from other FOIA exemptions in that its applicability depends not on the specific factual contents of a particular document; instead, the pertinent question is whether the information was furnished by a "confidential source" during the course of a legitimate criminal law investigation. Once that question is answered in the affirmative, all such information obtained from the confidential source receives protection.

*Lesar v. DOJ*, 204 U.S.App.D.C. 200, 636 F.2d 472, 492 (D.C.Cir.1980). *Accord Brant Construction Co. v. EPA*, 778 F.2d 1258, 1262–63 (7th Cir.1985); *Cuccaro v. Secretary of Labor*, 770 F.2d 355, 360 (3rd Cir.1985); *L & C Marine Transport, Ltd. v. United States*, 740 F.2d 919, 925 (11th Cir.1984); *Sands v. Murphy*, 633 F.2d 968, 970–71 (5th Cir.1980). Though in two cases appellee has cited, *Kiraly v. FBI*, 728 F.2d 273 (6th Cir.1984), and *Nix v. United States*, 572 F.2d 998 (4th Cir.1978), other circuits balanced interests, in neither did the court order disclosure and the language relied on by appellee is at most *dicta*.

■ In order to claim exemption 7(D) the government must demonstrate that the sources whose names it wishes to withhold were confidential sources. *See King v. DOJ*, 830 F.2d 210, 235 n. 182 (D.C.Cir. 1987); *accord Brant Construction Co. v.*

*EPA*, 778 F.2d at 1263. However, the FBI benefits from a presumption that an assurance of confidentiality was given where the circumstances indicate that the want of an assurance would impair its ability to elicit information. *Keys v. DOJ*, 830 F.2d 337, 345 (D.C.Cir.1987). Absent evidence to the contrary, "promises of confidentiality are 'inherently implicit' when the FBI solicits information." *Id.*

■ The government presented little direct evidence showing that confidentiality was promised to these sources. The government's identification of instances during the Schmerler investigation in which the Bureau sought to assure the confidentiality of information entrusted to it are almost entirely unrelated to the sources at issue now.

The government identified only one piece of evidence directly supporting the inference that confidentiality would have been necessary in order for the Bureau to solicit the information it sought from the Columbia sources. The Bureau had reason to believe that a defendant would make suggestions in his defense of sexual liaisons between Ms. Schmerler and some of the Indians. Letter from John Gung'l to Attorney General (Sept. 5, 1931), FBIHQ 70–1451–14, Lieberman Declaration, Exhibit Q; Memorandum for the Director from T.F. Baughman (Oct. 16, 1931), FBIHQ 70–1451–21. The first of the Columbia interviews was preceded by a letter dated September 10, 1931 from the Special Agent in Charge, El Paso, Texas, to the Special Agent in Charge, New York, New York, requesting that the latter solicit from Ms. Schmerler's friends at Columbia University letters written by Ms. Schmerler:

> It may be that some [redacted] will feel reluctant to surrender these letters in view of the fact that their contents might possibly create a bad impression about the dead girl.... You may assure them, of course [text missing from copy] any information obtained from the letters will not become a matter [text missing from copy] publicity.

Letter from R.H. Colvin to Special Agent in Charge, New York (Sept. 10, 1931), FBIHQ 70–1451–13.

Consequently, at least the first interviews were conducted with the anticipation that these sources might provide information embarrassing to Ms. Schmerler's family. The record before this Court leaves unclear whether the *friends* to whom Ms. Schmerler might have written were the same persons as the academics whose identity Appellee seeks. Moreover, the record before us does not disclose whether those persons interviewed during the investigation of the murder on July 30–31, 1931 and October 8, 1931 were the same persons as the sources interviewed in anticipation of the trial on January 20–21, 1932. And thus it is not possible to conclude that the concerns expressed in the September 10, 1931 letter necessarily extended to the January 20–21, 1932 interviews. Consequently, the FBI's exemption claim stands largely on the presumption of confidentiality. However, that is sufficient.

As discussed earlier, the law of this Circuit is that "in the absence of evidence to the contrary, promises of confidentiality are 'inherently implicit' when the FBI solicits information." *Keys v. DOJ*, 830 F.2d at 345. By demonstrating that the information was solicited during the course of law enforcement investigations, the FBI raises a presumption that assurances were given. Thus, the burden was on appellee to come forward with evidence that would rebut the presumption that the Bureau extended promises of confidentiality when it collected this information nearly sixty years ago. This burden may be met with evidence demonstrating that it would be unreasonable to infer from the circumstances surrounding the interviews that confidentiality had been extended.

Appellee argues, largely from the FBI reports of the interviews, that this Court should conclude that the circumstances surrounding the solicitation of information from the Columbia academics demonstrate that confidentiality was not necessary for the Bureau to gather the information it sought. Appellee states that the interview-

ees provided innocuous and favorable background and character information. Likewise, appellant argues, the fact that the witnesses were friendly to the Bureau's investigation and had no reason to fear disclosure shows that there was no need for confidentiality. Of a similar nature are the District Court's observations that these sources offered no clues to the murder and were not exposed to danger.

That the information ultimately was largely favorable cannot, without more, support the conclusion that the interviews were conducted without assurances of confidentiality. Rather than offering evidence of the circumstances surrounding the interviews, appellant offers only evidence of the substance of the interviews themselves. As our past decisions make clear, the substance of information provided in confidence does not determine the applicability of exemption 7(D). As then-Judge Scalia wrote, " 'the availability of Exemption 7(D) depends not upon the factual contents of the documents sought, but upon whether the *source* was confidential and the information was compiled during a criminal investigation.' " *Shaw v. FBI*, 749 F.2d 58, 61 (D.C.Cir.1984) (emphasis in original) (quoting *Weisberg v. DOJ*, 745 F.2d 1476, 1492 (D.C.Cir.1984)). Obviously, the information sought by appellant meets the test in *Shaw* and *Weisberg* for application of the 7(D) exemption.

Appellant further argues that an atmosphere of publicity surrounding the case demonstrates that the sources, who were aware of the dissemination of information by the Bureau, would not have expected that information they gave the Bureau would be held in confidence. However the record does not support the conclusion that the FBI disclosed any information about these sources or created an atmosphere such that the sources would not have expected the FBI to keep silent about their identities. Almost all of the examples appellee cites of publicity about this case occurred after the last of the Columbia interviews.

Finally, appellee notes that these interviews were conducted with the expectation that the sources might be called to testify at trial about the substance of the interview. Letter from R.H. Colvin to Special Agent in Charge (Jan. 13, 1932), FBIHQ 70–1451, Joint Appendix 152–53. Thus, he argues, the sources would have anticipated that their identities would soon be revealed.

Several circuits have considered the argument that the status of a source as a potential witness defeats the presumption of confidentiality. The Tenth Circuit case of *Poss v. NLRB*, 565 F.2d 654, 658 (10th Cir.1977), held that when the NLRB interviewed persons, telling them the *information* furnished would remain confidential unless the interviewees were called to testify, the Board did not guarantee total anonymity to the sources and exemption 7(D) did not apply. The Ninth Circuit in *Van Bourg, Allen, Weinberg & Roger v. NLRB*, 751 F.2d 982, 986 (9th Cir.1985), held that witnesses who submit affidavits have no reasonable expectation of privacy and should expect their names and testimony to be revealed if the investigation results in a formal hearing. The Second Circuit, on the other hand, rejected the potential witness rule in *United Technologies Corp. v. NLRB*, 777 F.2d 90, 94 (2d Cir.1985). That court found that "confidential source" includes those who are promised or reasonably expect confidentiality unless or until called as a witness. *Id.*

Appellant argues that, as the Third Circuit stated in *Lame v. DOJ*, 654 F.2d 917, 925 (3rd Cir.1981), "If a source expects that he will, at some later date, publicly testify regarding the information he has provided, it may be difficult to imply an assurance of confidentiality...." The First Circuit examined similar arguments in *Irons I*, 811 F.2d at 681. *Irons I* addressed a claim that willingness to testify indicated that the interviewee had waived his right to remain hidden from public view, making several observations that touch on the problem we must address.

There are simply too many plausible explanations for a person's initial willingness to testify: he may know that he can recant at any time prior to raising his

right hand, he may be gambling on the unlikelihood of his testimony ultimately proving to be needed, he may feel that his evidence will be directed toward a much narrower field (enabling him to camouflage his true role notwithstanding his court appearance), or he may be downright fearful of declining the government's invitation. The possibilities are virtually endless. Given the myriad of potential variations on the theme, to read automatically into every such acquiescence an across-the-board renunciation of the usual assurance of confidentiality seems to require several leaps in logic. . . .

The government, at the outset of a criminal investigation, would be caught between the devil and the deep blue sea: forced to decide, *a priori*, which witnesses should be ceded confidentiality and which reserved for trial testimony.

*Id.* at 687–88.

We share the concerns expressed in *Irons I.* It would defeat the purpose of FOIA exemption 7(D) to hold that the possibility of trial testimony to some or all of the substance of an FBI interview establishes that the source had no expectation that his identity would remain undisclosed. *See Lesar v. DOJ,* 636 F.2d at 490–91. Exemption 7(D) recognizes that the ability to receive information in confidence is a critical piece of law enforcement officers' investigatory apparatus. To hold that by gathering information that might also be used in court, law enforcement agencies implicitly sacrifice their tool of confidentiality is implausible.

The government has proffered sufficient evidence to raise a presumption that these interviews were conducted in confidence. In response appellee has presented the barest evidence that some of the interviews were conducted with the interviewees' knowledge that they might be called to testify to the substance of their remarks. The evidence in this case does not tell us what statements, promises, or assurances were given to the sources. We know only

that the FBI discussed with several of the sources the possibility that they might be called to testify. In this case, we could conclude that the potential of trial testimony rebuts the presumption of confidentiality only by establishing a *per se* rule to that effect.

But there are simply too many scenarios possible in which, although testimony was contemplated, a promise of confidentiality was necessary to elicit the information to allow us to turn the logic of *Lame* into a *per se* rule that the possibility of trial testimony without more negates the presumption the Bureau elicited information under an implied promise of confidentiality. Under these circumstances we must conclude that the knowledge that the informant might have to testify to some portion of information given during a criminal investigation and preparation for prosecution is not sufficient to rebut the presumption of confidentiality.

III. CONCLUSION

The undisputed record evidence shows that the sources at issue here gave information to the Bureau of Investigation in the course of a criminal investigation. The Bureau is entitled to a presumption that the interviews with these sources were conducted with implicit assurances of confidentiality. The claims appellee has put forward, including evidence that these sources were potential witnesses, is not sufficient to rebut the presumption. The order of the District Court is therefore *Reversed.*